## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**DIANA JACKSON,**

       **Plaintiff,**

                                :

**v.**                                  **Case No. 2:22-cv-3955**
                                                 **Judge Sarah D. Morrison**
                                                 **Magistrate Judge Chelsey M.**

**HARTFORD LIFE AND**              **Vascura**
**ACCIDENT INSURANCE**
**COMPANY,**                               :

       **Defendant.**

## OPINION AND ORDER

Plaintiff Diana Jackson brings this action under Section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA") [29 U.S.C. § 1132] following Defendant Hartford Life and Accident Insurance Company's decision to terminate benefits. (Compl., ECF No. 1.) The Administrative Record was filed under seal (Admin. R. Vols. I–VI, ECF Nos. 18–23) and the parties filed cross-motions for judgment (ECF Nos. 26, 27). Ms. Jackson and Hartford have each responded to the other's motion and replied in support of their own. (ECF Nos. 28, 29.)

For the reasons below, Hartford's Motion for Judgment on the Administrative Record (ECF No. 27) is **GRANTED** and Ms. Jackson's (ECF No. 26) is **DENIED**.

## I.    FACTUAL BACKGROUND

### A.    As an employee of Ames Department Store, Ms. Jackson was covered under the LTD Policy and the Life Policy.

From 1995 to 2001, Ms. Jackson worked as a receiving clerk in the warehouse at Ames Department Store. (Admin. R. Vol. IV, PAGEID # 1990.) For the benefit of

its employees, Ames purchased several group insurance policies issued by Hartford. (Admin. R. Vol. I, PAGEID # 52 *et seq*.) Those policies included, among others, a long-term disability insurance policy (the "LTD Policy") (*id*. at PAGEID # 67) and a life insurance policy (the "Life Policy") (*id*. at PAGEID # 87). As an Ames employee, Ms. Jackson was covered under each.

*LTD Policy*. The LTD Policy provides income benefits to participants who become Disabled. (*See* Admin. R. Vol. I, PAGEID # 67.) Disabled means that:

> you [the participant] are prevented by:
>
> 1. accidental bodily injury;
> 2. sickness;
> 3. Mental Illness;
> 4. Substance Abuse; or
> 5. pregnancy,
>
> from performing . . . one or more of the Essential Duties of Any Occupation.

(*Id*., PAGEID # 83.) Any Occupation is defined as "an occupation for which you [the participant] are qualified by education, training or experience" and which meets a specified earnings threshold. (*Id*.)

To make a claim under the LTD Policy, and periodically thereafter if Disabled, a claimant must submit Proof of Loss to Hartford. (*Id*., PAGEID # 81.) Proof of Loss includes documentation of the status and prognosis of a participant's disabling condition, along with "any and all medical information, including x-ray films and photocopies of medical records[.]" (*Id*.) The LTD Policy allows Hartford to "have [the participant] examined to determine if [they] are Disabled." (*Id*.)

2

*Life Policy*. The Life Policy provides that a participant's life insurance premiums will be waived when she is "Disabled." (*Id.*, PAGEID # 96.) The Life Policy contains its own definition of "Disabled," which resembles the LTD Policy's. Under the Life Policy, "Disabled" means

> a condition that prevents [the participant] from doing any work for which [she is] or could become qualified by education, training or experience and it is expected that this condition will last for at least nine consecutive months . . . ; or [the participant has] been diagnosed with a life expectancy of 12 months or less.

(*Id.*, PAGEID # 97.)

## B.    Ms. Jackson was first approved for disability benefits in 2002.

In 2002, Hartford determined that back pain and headaches prevented Ms. Jackson from performing the essential functions of her job and approved her claim for LTD Policy benefits.[1] (Admin. R. Vol. V, PAGEID # 2088; *see also* Admin. R. Vol. I, PAGEID # 532.) The decision was supported by (i) an MRI of her lumbar spine showing "[d]egenerative disc disease at L4-L5 and L5-S1 greater than L3-L4" along with "moderate central HNP [herniated nucleus pulposus] at L5-S1" (Admin. R. Vol. V, PAGEID # 2094) and (ii) medical records from Ms. Jackson's treating physicians documenting "crippling" chronic pain in her low back and legs (*see id.*, PAGEID # 2044).

Over the next nineteen years, Hartford collected medical records and Attending Physician Statements (APS) (*see, e.g.*, Admin. R. Vol. I, PAGEID # 243–44), conducted interviews and surveillance (*see, e.g.*, Admin. R. Vol. IV, PAGEID #

---

[1] Hartford approved Ms. Jackson's claim for waiver of Life Policy premiums in 2003. (Admin. R. Vol. III, PAGEID # 1456.)

3

1725–1812, 1813–26), and engaged consultants (*see, e.g.*, Admin. R. Vol. III, PAGEID # 1508–14) to regularly evaluate Ms. Jackson's continued eligibility for LTD Policy benefits. Notably, during that time, the Social Security Administration approved Ms. Jackson's claim for disability insurance benefits  (Admin R. Vol. IV, PAGEID # 1915–23) and her primary care physician, Charles Kistler, M.D., repeatedly opined that Ms. Jackson was completely unable to perform in a work environment (*see, e.g.*, Admin R. Vol. III, PAGEID # 1366, 1466, 1483, 1594).

### C. Hartford terminated Ms. Jackson's benefits in October 2021.

#### 1. Updated Medical Records

In March 2021, Ms. Jackson told Hartford she was treating with a new orthopedic surgeon, Richard Fischer, M.D., and a new primary care physician, Mark Ricaurte, M.D. (Admin. R. Vol. I, PAGEID # 394.) Hartford requested medical records from these physicians. (*Id.*, PAGEID # 393.)

Dr. Fischer saw Ms. Jackson in February 2021 for left shoulder pain. He noted that Ms. Jackson sustained an injury after "she shoveled a lot of heavy snow[.]" (Admin. R. Vol. II, PAGEID # 994.) Dr. Fischer observed that Ms. Jackson had a "normal gait and stance[,]" was "alert and oriented[,]" and had "full passive range of motion of the cervical spine without referred pain." (*Id.*) He administered a cortisone injection for the shoulder pain with immediate positive results. (*Id.*, PAGEID # 995.)

Ms. Jackson started treating with Dr. Ricaurte in March 2019. (Admin. R. Vol. I, PAGEID # 703.) Dr. Ricaurte observed at that time that Ms. Jackson had lost

70 pounds since gastric bypass surgery six-months earlier.[2] (*Id.*, PAGEID # 703–04.) He also noted that Ms. Jackson was "ambulating normally" with "normal movement of all extremities" and "normal curvature" of the spine. (*Id.*, PAGEID # 704.)

September 2019 and March 2020 visits with Dr. Ricaurte showed similar findings. (*Id.*, PAGEID # 712–21.) He noted that Ms. Jackson "walk[ed] without restrictions" and had no difficulty walking or climbing stairs. (*Id.*, PAGEID # 712.) Then, during an April 2020 visit, Ms. Jackson reported that she "tries to walk outside or use a treadmill for at least 30 minutes every day." (*Id.*, PAGEID # 727.) She had also been "weight training but has not been able to lately due to arthritis flare up in her hands." (*Id.*)

Dr. Ricaurte ordered an x-ray of Ms. Jackson's lumbar spine in November 2020. (*See id.*, PAGEID # 811.) The imaging revealed "mild intervertebral disc height loss at L3-L4, L4-5 and L5-S1" along with "[m]oderate multilevel degenerative changes [in] lumbar spine." (*Id.*, PAGEID # 815.)

At an April 15, 2021 appointment with Dr. Ricaurte, Ms. Jackson complained of "increased anxiety" and "shooting pain down her back and then it feels like it locks up." (*Id.*, PAGEID # 747.)

### 2. Independent Medical Examination

After reviewing the treatment records from Drs. Fischer and Ricaurte, Hartford concluded that "the records do not provide a clear level of function[,]" as

---

[2] Ultimately, Ms. Jackson lost more than 100 pounds. No one argues that her substantial weight loss contributed to any improvement in her back pain or expansion of her functional capacity.

they both confirm multi-level degenerative disc disorder and reflect stability with full range of motion. (Admin. R. Vol. I, PAGEID # 386.) Hartford's Clinical Management reviewer recommended an Independent Medical Examination ("IME") with an orthopedist "to clarify [Ms. Jackson's] level of function." (*Id*.)

Orin Hall, M.D. conducted an IME on August 13, 2021. (*See* Admin. R. Vol. III, PAGEID # 1219.) Dr. Hall's report summarized Ms. Jackson's history and current complaints before turning to the physical examination results. (*Id*., PAGEID # 1220–21.) He then summarized the treatment records reviewed, including notes dating back to 1999. Ultimately, Dr. Hall opined that:

> Ms. Jackson would be capable of working with the recommended restrictions as outlined below. The basis for my recommendation stems from my review of the provided records as well as today's examination findings. Such findings include a slightly antalgic gait and the fact she had a minimal amount of difficulty with heel and toe walking and squatting unassisted. She was also found to have decreased range of motion of her lumbar spine with 4/5 muscle strength noted at both hip flexor muscle groups. She had decreased sensation noted at the left upper extremity in the C6 through C8 nerve root distributions and at the left lower extremity in the L4 through S1 nerve root distributions. There were no other focal neurological deficits noted.

(*Id*., PAGEID # 1239.) He further recommended the following restrictions:

> [S]tand a total of 2 hours in an 8 hour shift up to 30 minutes at a time.

> [W]alk a total of 2 hours in an 8 hour shift up to 30 minutes at a time.

> [S]it a total of 8 hours in an 8 hour shift.

(*Id*.)

Hartford shared Dr. Hall's report with Ms. Jackson's treating physicians. Dr. Kistler indicated that he disagreed with the conclusions but did not provide any

6

explanation. (Admin. R. Vol. II, PAGEID # 1130.) Dr. Fischer neither agreed nor
disagreed. (*Id*., PAGEID # 1159.) Dr. Ricaurte did not respond.

### 3.    Employability Analysis Report

On September 3, 2021, Hartford created an Employability Analysis Report
("EAR") using Dr. Hall's opined limitations. (*Id*., PAGEID # 1131.) Per the
September 2021 EAR, there were at least five "viable employment matches" for Ms.
Jackson in the workforce. (*Id*., PAGEID # 1133.)

### 4.    Claim Denial Letter

On October 1, 2021, Hartford sent Ms. Jackson a letter concluding that she
did not meet the LTD Policy's definition of Disabled beyond that date. (Admin. R.
Vol. I, PAGEID # 149–57.) The letter first identifies the relevant terms of the LTD
Policy. It then explains that LTD Policy benefits and Social Security disability
benefits have different eligibility and ongoing requirements. The letter then
summarizes the records relied upon in making the adverse benefit determination—
including Dr. Hall's IME report and the September 2021 EAR. It concludes with a
summary of Ms. Jackson's appeal rights.

## D.    Hartford denied Ms. Jackson's appeal in October 2022.

### 1.    Updated Medical Records

Ms. Jackson filed her notice of appeal on March 18, 2022. (Admin. R. Vol. II,
PAGEID # 1061.) She provided Hartford with updated records from several
providers, including: Dr. Kistler; Raymond Wurapa, M.D.; Craig Dimitris, M.D.;
Roberta Michelle Watts, CNP; and Charles Paugh, PhD. (*See, e.g., id.*, PAGEID
# 954.)

Dr. Kistler's updated records include a November 10, 2021 MRI of Ms. Jackson's lumbar spine. (*Id.*, PAGEID # 1013.) The MRI revealed "[m]ild degenerative changes with mild foraminal narrowing most pronounced L3-L4" with "[s]mall lesions within L5 and S1 which are nonspecific but can be due to atypical hemangiomas." (*Id.*, PAGEID # 1014.)

Dr. Dimitris treated symptoms of osteoarthritis in Ms. Jackson's left thumb in 2019. (*Id.*, PAGEID # 956–66.) Dr. Wurapa treated her right thumb in 2020. (*Id.*, PAGEID # 967–71.)

Nurse Watts submitted an Attending Physician Statement (APS) dated August 23, 2022. (Admin. R. Vol. I, PAGEID # 605–06.) Although the APS is largely illegible, it does state that Ms. Jackson is "permanently and totally disabled from all employment duties." Nurse Watts also submitted a letter opining that Ms. Jackson has "significant physical and psychological limitations" that render her "unable to maintain employment[.]" (*Id.*, PAGEID # 608.)

Dr. Paugh completed a psychological evaluation of Ms. Jackson on August 29, 2022. (*Id.*, PAGEID # 597–603.) Dr. Paugh was also Ms. Jackson's treating psychologist, having established a relationship with her five months prior. (*Id.*, PAGEID # 598.) Dr. Paugh summarized his conclusions:

> The following conclusions regarding Diana Jackson's condition as it applies to the potential designation of global disability impairment was based on results of information obtained during multiple interviews with the patient, psychological testing, and a medical record review of available information.
>
> Having the opportunity to conduct interviews on four separate occasions, prior to the awareness of this disability determination, I had ascertained information from Ms. Jackson that identified a history of

anxiety that extends back approximately 20 years or longer. This condition worsened with the serious car accident resulting in a traffic fatality and injuries to the patient. Up until April of this year Diana had only treated using psychotropics which are only designed to provide symptom relief. She continues to have impairments in many areas of daily activities such as her ability to manage stressors or concentration/persistence/pace.

Based on information received from the multiple interviews, record review, preliminary self-administered psychological testing in addition to a reasonable degree of psychological certainty, I have concluded that Diana Jackson is permanent and totally impaired as a result of her diagnosis of Generalized Anxiety Disorder and PTSD. As well as lingering issues related to Bereavement. She would be unable successfully engage in vocational rehabilitation or sustain remunerative employment.

(*Id.*, PAGEID # 602–03.)

## 2. Independent Medical Review

Hartford engaged a medical consultant, Charles Renninger, M.D., and a psychological consultant, Veronika Glusker, Psy.D., to perform Independent Medical Reviews ("IMR") of Ms. Jackson's medical records. Drs. Renninger and Glusker were asked to opine on Ms. Jackson's "overall functionality" from October 2, 2021 (the first date on which she no longer satisfied the definition of Disability) onward. (*See, e.g., id.*, PAGEID # 660.)

*Dr. Renninger*. Dr. Renninger, a board-certified orthopedic surgeon, first reviewed and summarized Ms. Jackson's medical records. (*Id.*, PAGEID # 637–60, 694.) He then noted that he tried but was unable to reach Nurse Watts and, while he did speak with Dr. Kistler, there was no additional information provided. (*Id.*, PAGEID # 660.) Dr. Renninger then opined that Ms. Jackson had the following functional limitations:

9

> Sitting: up to 40 mins. at a time, up to 6 hrs./day
>
> Standing: up to 10 mins. at a time, up to 1 hr./day
>
> Walking: up to 10 mins. at a time, up to 1 hr./day

(*Id.*, PAGEID # 661.) He further found that Ms. Jackson's

> self-reported symptoms and activities of daily living are not supported
> by the clinical exam findings and objective medical information. She
> does have degenerative disc disease in her lumbar spine and severe
> osteoarthritis in her left thumb. However, there are no objective
> examination findings in the medical records provided to support the
> severity of the claimant's self-reported symptoms and activities of daily
> living. There are no findings of upper extremity range of motion,
> strength, sensation, or deep tendon reflexes to indicate lack of function.
> The same applies to the claimant's lower extremities. There has been no
> follow up on the claimant's left hand and thumb pain. Physical therapy
> was prescribed but there are no records to indicate if the claimant
> attended any sessions.

(*Id.*, PAGEID # 662.) Dr. Renninger concluded by stating his "professional medical

opinion that the provided documentation does not support that [Ms. Jackson] was

experiencing chronic pain as of 10/2/2021 through the present of a severity that

would prevent her from performing full-time work." (*Id.*, PAGEID # 663; *see also id.*,

PAGEID # 695.)

_Dr. Glusker_. Dr. Glusker is a board-certified psychologist. (*Id.*, PAGEID

# 668.) She reviewed and summarized Ms. Jackson's records with a focus on

psychological impairment. (*Id.*, PAGEID # 669.) She explained:

> While [Ms. Jackson's] ongoing stressors, traumatic losses, and
> symptoms of anxiety are acknowledged, her symptoms were not of a
> severity as to limit occupational functioning. The claimant's mental
> status examinations indicated that she presented as mildly anxious and
> tearful but had no evidence of other abnormalities. Thus, the claimant's
> findings upon mental status examination would not preclude her from
> work activities or daily functioning. The claimant reported having a
> diagnosis of post-traumatic stress disorder, but there was no indication

10

of referrals for EMDR or trauma therapy. In addition, the claimant does not have any evidence of psychomotor agitation, psychosis, delusions, hallucinations, homicidality, suicidality (intent or plan), self-destructive behaviors, inability to perform [activities of daily living], or involuntary psychiatric hospitalizations. The claimant has not required a higher level of care needed for her psychiatric conditions, such as [intensive outpatient], [partial hospitalization], or hospitalization. . . . There was also no mention of impairment in insight and judgment. There was no indication that the claimant was treating with a psychiatrist for medication management, and given that disability is being considered, one would expect monthly medication adjustments and multiple notes from a psychiatrist. . . . Therefore, restrictions and limitations are not supported.

(*Id.*, PAGEID # 671.) Dr. Glusker concluded that "there is no evidence of findings to suggest limitations in [Ms. Jackson's] status as of 10/2/21 through the present." (*Id.*; *see also id.*, PAGEID # 699–700.)

### 3.     Updated EAR

After Drs. Renninger and Glusker completed their IMRs, Hartford performed a second EAR. (*Id.*, PAGEID # 611.) This one, dated July 29, 2022, incorporated the more restrictive functional limitations opined by Dr. Renninger. Still, the same five occupations are identified as viable employment matches. (*Id.*, PAGEID # 613.)

### 4.     Appeal Denial Letter

On October 20, 2022, Hartford sent Ms. Jackson a letter denying her appeal. (*Id.*, PAGEID # 120–25.) The letter listed all new medical evidence considered before summarizing the IMRs and updated EAR. It concluded by advising Ms. Jackson that the initial determination—that she was no longer Disabled—was being upheld.

After receiving Harford's decision on appeal, Ms. Jackson filed the instant action.

## II.    STANDARD OF REVIEW

In a challenge to denial of benefits under ERISA § 502, the plaintiff must prove, by a preponderance of evidence, that she is entitled to receive the benefit. *Javery v. Lucent Tech., Inc. Long Term Disability Plan*, 741 F.3d 686, 700–01 (6th Cir. 2014) (citing *Tracy v. Pharmacia & Upjohn Absence Payment Plan*, 195 F. App'x 511, 516 n. 4 (6th Cir. 2006)). ERISA benefit determinations are reviewed *de novo* unless the plan expressly grants its administrator or fiduciary discretionary authority "to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If a plan grants discretionary authority, "application of the highly deferential arbitrary and capricious standard of review is appropriate[.]" *Yaeger v. Reliance Std. Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). Here, the parties disagree about whether *de novo* or arbitrary-and-capricious review applies. Because the LTD and Life Policies give Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions" (Admin. R. Vol. I, PAGEID # 83, 100), the Court proceeds under the arbitrary-and-capricious standard.

"A decision reviewed according to the arbitrary and capricious standard must be upheld if it results from 'a deliberate principled reasoning process' and is supported by 'substantial evidence.'" *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010) (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)). As the Sixth Circuit points out, this test has both a substantive component (substantial evidence) and a procedural one (deliberate and principled reasoning process). *Autran v. Procter & Gamble*

*Health and Long-Term Disability Benefit Plan*, 27 F.4th 405, 411 (6th Cir. 2022). Substantial evidence exists "if a rational person could conclude that the evidence was adequate to justify the decision." *Id.* at 412 (internal quotation and citation omitted). Though a deliberate, principled reasoning process is not so easy to define, courts often ask questions like:

> Did the administrator consider all the evidence or overlook evidence that cut the other way? If the administrator departed from its earlier benefits ruling, did it adequately explain the change? If the Social Security Administration found that the participant was disabled under federal law, did the administrator consider this ruling? If the administrator credited certain doctors over others, did the credited doctors undertake a mere "file" review or conduct a thorough in-person evaluation? And did the administrator have a conflict of interest that affected its decision?

(*Id.*) (collecting cases). Though deferential, arbitrary-and-capricious review is no "rubber stamp"—rather the court examines the "quantity and quality of the . . . evidence on each side." *Schwalm*, 626 F.3d at 308 (citing *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006)). If, following such review, "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003) (quoting *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989)).

## III. ANALYSIS

### A. LTD Policy — Disability Benefits

Hartford argues that its decision to terminate Ms. Jackson's benefits in October 2021 was neither arbitrary nor capricious because, at that point, she failed to satisfy the LTD Policy's definition of Disability. The LTD Policy provides that a

13

participant is only entitled to further benefits if she is unable to perform the essential duties of any occupation for which she is qualified by education, training, or experience. Hartford believes that the opinions of the medical examiner and medical reviewers, the medical records and clinical evidence, and the EARs support its conclusion that Ms. Jackson is now able to work certain sedentary, unskilled jobs. The Court agrees.

Substantial evidence supports Hartford's decision to terminate Ms. Jackson's benefits. Dr. Hall examined Ms. Jackson on August 31, 2021. (Admin. R. Vol. III, PAGEID # 1219–41.) He noted Ms. Jackson's subjective reports before performing a physical examination. Dr. Hall observed that Ms. Jackson had a "slightly antalgic gait" but only a "minimal amount of difficulty with heel and toe walking and squatting unassisted." He noted "multiple arthritic nodules" on Ms. Jackson's hands, but observed "good grip and pinch strength bilaterally." Dr. Hall reported "decreased range of motion and pain with movement" at the cervical spine, but "otherwise full range of motion at both upper extremities and both lower extremities." Ms. Jackson showed "4/5 muscle strength . . . at both hip flexor muscle groups" and "5/5 muscle strength in both upper extremities and both lower extremities." After examining Ms. Jackson and reviewing her medical records, Dr. Hall opined that "Ms. Jackson would be capable of working" with certain limitations. Dr. Renninger, a board-certified orthopedic surgeon, reviewed Ms. Jackson's file on appeal and came to the same conclusion. (Admin. R. Vol. I, PAGEID # 637–64, 694–96.) Board-certified psychologist Dr. Glusker went one step

further, finding that Ms. Jackson's psychiatric condition warranted no occupations restrictions or limitations. (*Id.*, PAGEID # 668–72, 699–700.) Hartford also identified five "viable employment matches" that account for Ms. Jackson's functional capacity (as opined by Dr. Renninger), training and experience, and prior wage. (*Id.*, PAGEID # 611–31.)

Ms. Jackson highlights records that cut in the other direction: that Nurse Watts, Dr. Paugh, and Dr. Kistler opined (in Dr. Kistler's case, repeatedly) that she could not return to the workplace; that she continued to suffer from degenerative disc disease; and that she now suffered from arthritis in her hands. But pointing to evidence supporting an opposite conclusion does not establish that Hartford's decision to terminate benefits is unsupported by substantial evidence. *See Autran*, 27 F.4th at 412 (6th Cir. 2022) ("[W]hen the record contains evidence that could support a rational decision in either direction . . . , the administrator's choice between this conflicting evidence cannot be considered arbitrary on substantive grounds."); *Fenwick v. Hartford Life & Accident Ins. Co.*, 841 F. App'x 847, 857 (6th Cir. 2021).

Hartford's Motion for Judgment on the Administrative Record is thus **GRANTED**.

Ms. Jackson makes several arguments for the opposite conclusion. None is availing.

### 1. Ms. Jackson argues there was no evidence that her condition improved.

Ms. Jackson first asserts that Hartford's decision to terminate her benefits should be reversed because there is no evidence that her decades-long condition has improved. (ECF No. 26, *citing, inter alia, Kramer v. Paul Revere Life Ins. Co.*, 571 F.3d 499, 507 (6th Cir. 2009) (reversing the district court's decision to uphold a termination of disability benefits in part because "there is no explanation for the decision to cancel benefits that had been paid for some five years based upon the initial determination of total disability in the absence of any medical evidence that the plaintiff's condition had improved during that time"). The record belies this assertion. Treatment notes from Drs. Fischer and Ricaurte indicated that Ms. Jackson's back pain may have abated and her ability to engage in physical activity may have improved. Noting this possible change, Hartford engaged Dr. Hall to conduct a review of Ms. Jackson's file and a physical examination of Ms. Jackson herself. That exam supported Hartford's conclusion that Ms. Jackson's condition had improved, such that she was no longer Disabled.

### 2. Ms. Jackson challenges the reliability of Hartford's evidence.

Ms. Jackson next attacks the reliability of the evidence Hartford uses to support its decision.

#### a) Dr. Hall's IME Report

Ms. Jackson raises three separate concerns about Dr. Hall's IME's report. First, she asserts that Hartford "cherry-picked" the record by failing to provide Dr. Hall with materials favorable to her position. She complains that Dr. Hall was not

given Dr. William Fitz's 2008 IME report or the decision approving her claim for Social Security disability benefits in 2005.[3] Ms. Jackson does not identify anything in or about those documents that would have altered Dr. Hall's conclusion. Instead, she theorizes that "Hartford did not want Dr. Hall to know that other physicians had found [her] to be disabled." (ECF No. 28, PAGEID # 2717.) But her theory does not hold water: Dr. Hall was provided with the many Attending Physician Statements in which Dr. Kistler concluded that Ms. Jackson was "permanently and totally disabled."

Next, Ms. Jackson urges the Court to discount Dr. Hall's report because he "performed no provocative testing." (ECF No. 26, PAGEID # 2676.) Her only supporting evidence, however, is a list of provocative tests for lumbar spondylosis pulled from "physio-pedia.com." This list proves nothing.

Finally, Ms. Jackson takes issue with what she perceives to be an inconsistency between the observations and conclusions in Dr. Hall's report. For example, Ms. Jackson notes that Dr. Hall observed arthritic nodules on her hands and a decreased range of motion in her cervical spine, yet opined that she had no restrictions in reaching, handling, fingering, or feeling. She does not propose a more appropriate level of functional capacity or offer anything (but her *ipse dixit*) to demonstrate that the observation and conclusion are in fact inconsistent.

---

[3] Ms. Jackson also complains that Hartford did not give Dr. Hall medical records describing the severe osteoarthritis in her hands. She later acknowledges that Hartford did not have any such records to give – neither Dr. Wurapa's nor Dr. Dimitris's treatment notes were provided to Hartford before Dr. Hall completed his examination.

### b)  Dr. Renninger's IMR

Ms. Jackson next argues that Dr. Renninger's IMR report "clearly"—but inappropriately—"relied on credibility assessments." (ECF No. 28, PAGEID # 2719.) Not so. Dr. Renninger opined that the objective medical evidence in the record did not support Ms. Jackson's self-reported symptoms and activities of daily living. That is a comparative observation, <u>not</u> a credibility assessment. *Cf. Leppert v. Liberty Life Assurance Co. of Boston*, 661 F. App'x 425, 438 (6th Cir. 2016) (dismissing claimant's assertion that insurer made an improper credibility assessment based on file review by explaining that insurer "did not say that it believed [claimant] was malingering" when it "accurately pointed out that there is no objective medical evidence in the record" to support claimant's self-reported symptoms).

### c)  Dr. Glusker's IMR

Ms. Jackson also attacks the reliability of Dr. Glusker's IMR. She argues that "[i]t is axiomatic that competent evaluation of a claimant's mental illness requires an in-person evaluation." (ECF No. 28, PAGEID # 2719.) Though there is nothing "inherently objectionable about a file review by a qualified [provider] in the context of a benefits determination," *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005), courts generally accord greater weight to the opinions of providers— especially psychiatrists and psychologists—who have examined the claimant in-person. *See Autran*, 27 F.4th at 412 ("If the administrator credited certain doctors over others, did the credited doctors undertake a mere 'file' review or conduct a thorough in-person evaluation?"); *see also Javery*, 741 F.3d at 702 (explaining that "file reviews are questionable as a basis for identifying whether an individual is

18

disabled by mental illness") (citing *Smith v. Bayer Corp. Long Term Disability Plan*, 275 F. App'x 495, 508 (6th Cir. 2008) (explaining that in-person examination is particularly important in evaluating claimed mental impairments)).

The issue here is not so much whether Ms. Jackson was disabled by mental illness, as it is whether Ms. Jackson had a documented history of disabling mental illness.[4] The LTD Policy requires Proof of Loss satisfactory to Hartford. Hartford relied on Dr. Glusker's review of the record to conclude that there was not sufficient clinical evidence of any disabling mental condition, and it acted reasonably in doing so.[5]

Dr. Glusker had access to twenty years' worth of Ms. Jackson's medical records. Her report summarized the evidence as it pertained to Ms. Jackson's mental health—and highlighted the paucity of that evidence. She noted that Ms.

---

[4] Dr. Glusker's IMR states: "The claimant reported having symptoms of anxiety and post-traumatic stress disorder for 20 years which suggests that her symptoms preceded the time period in question and that the claimant was able to work for years despite her symptoms." (Admin. R. Vol. I, PAGEID # 700.) Ms. Jackson argues that this proves Dr. Glusker did not closely examine the record, which showed that Ms. Jackson had not in fact worked for the previous 20 years. But Dr. Glusker was only asked whether the record reflected impairment from October 2, 2021 (the date her benefits ended) onward. As Ms. Jackson noted in the context of Dr. Hall's IME, Hartford's provider consultants were not provided with earlier documents concluding that Ms. Jackson was disabled, like the Social Security disability determination or 2008 IME. What's more, there is no indication that the duration of Ms. Jackson's symptoms relative to her work history outweighed Dr. Glusker's assessment of the scarce objective evidence of mental impairment in the record.

[5] To the extent Ms. Jackson argues that she is entitled to LTD Policy benefits on account of her psychiatric condition, she fails. For the same reasons Dr. Glusker opines that Ms. Jackson does not require occupational limitations, the Court finds Ms. Jackson fails to carry her burden of proof by a preponderance of the evidence.

Jackson's documented mental status exams "indicated that she presented as mildly anxious and tearful but had no evidence of other abnormalities." (Admin. R. Vol. I, PAGEID # 671.) And, although Dr. Paugh diagnosed Ms. Jackson with generalized anxiety disorder and post-traumatic stress disorder (PTSD), there was "no indication of referrals for neuropsychological testing . . . , EMDR[6] or trauma therapy" or any "higher levels of care such as [intensive outpatient], [partial hospitalization], or hospitalization." (*Id.*, PAGEID # 700.)

Finally, Dr. Glusker acknowledged that Ms. Jackson presented to the emergency room in March 2022 with anxiety symptoms, but found that other evidence of a disabling psychiatric condition—such as hospital admission, treatment and medication management by a psychiatrist, or symptoms commonly associated with impairment—was not present in the record.

### d)      Hartford's EARs

Ms. Jackson argues that Hartford's Employability Assessment Reports are flawed because the identified occupations would require training on tools and materials, which is inconsistent with the LTD Policy language.[7] Ms. Jackson misreads the relevant language.

_____

[6] "Eye movement desensitization and reprocessing therapy, commonly known as EMDR, is a mental health therapy method. EMDR treats mental health conditions that happen because of memories from traumatic events in your past. It's best known for its role in treating post-traumatic stress disorder (PTSD), but its use is expanding to include treatment of many other conditions." CLEVELAND CLINIC, EMDR Therapy, available at https://my.clevelandclinic.org/health/treatments/22641-emdr-therapy (last visited June 23, 2024).

[7] Ms. Jackson also argues that the EAR is inconsistent with Dr. Renninger's opinion that she can sit for only six hours in an eight-hour shift. In her view,

It is "a fundamental principle of ERISA law—the plain language of the plan controls." *West v. AK Steel Corp. Retirement Accumulation Pension Plan*, 318 F. Supp. 2d 579, 585 (S.D. Ohio 2004) (Beckwith, J.) (citation omitted). The LTD Policy defines "Any Occupation" as those for which the claimant is "qualified by education, training *or* experience[.]" (Admin. R. Vol. I, PAGEID # 83 (emphasis added).) The "or" is disjunctive—meaning, an occupation for which Ms. Jackson is qualified by education or experience alone satisfies the definition.

In performing the EAR, Hartford adjusted the Specific Vocational Preparation level downward to account for Ms. Jackson's limited education and experience, thus "ensur[ing] occupations requiring short demonstration only were considered." (*See id.*, PAGEID # 612.) That the occupations identified would require some training on materials and tools does not mean that Ms. Jackson's education and experience are insufficient for her to perform the roles.

### 3. Ms. Jackson's remaining arguments also fail.

Ms. Jackson's remaining arguments are easily disposed of.

*Social Security Finding*. First, she argues that Hartford failed to explain the basis for departing from the Social Security Administration's 2005 disability finding. (ECF No. 28 (citing 29 C.F.R. § 2560.503-1(g)(1)(vii)(A)(iii)).) The Court disagrees. Hartford's claim denial letter explained:

---

"common sense suggests" that the identified occupations require "sitting (without breaks) . . . for a full eight-hour shift." (ECF No. 28, PAGEID # 2722.) But Hartford specifically incorporated Dr. Renninger's functional limitations in the second EAR's search parameters. (*See* Admin. R. Vol. I, PAGEID # 611–12.) Ms. Jackson's unsupported perception of what those occupations might actually entail does nothing to undermine the results of that search.

> The Social Security Administration approved your Social Security Disability claim . . . . Unlike the Social Security Administration (SSA), we continue to gather additional information and assess your entitlement to Long Term Disability (LTD) benefits on an ongoing basis, as provided in the policy.

(Admin. R. Vol. I, PAGEID # 151.) The balance of the letter explains why that later-gathered information drove Hartford's decision to terminate benefits under the LTD Policy.

_Improper Delegation of Authority_. Ms. Jackson argues that Hartford "essentially delegated its decision-making" on appeal to Drs. Renninger and Glusker and thus abdicated its fiduciary responsibilities. (ECF No. 28, PAGEID # 2709–10.) The appeal denial letter proves otherwise. In that letter, Hartford identifies medical evidence that it reviewed before forwarding to its consultants, summarizes the results of a renewed EAR, and summarizes additional evidence provided by Ms. Jackson during the appeal process.[8] This does not indicate a delegation of decision-making authority.

_Post Hoc Explanation_. Ms. Jackson next asserts that Hartford makes an impermissible _post hoc_ explanation for its decision. Ms. Jackson reads Hartford's brief as saying that a "conflict among [her] physicians [was] a basis for concluding that [Ms.] Jackson was no longer disabled." (ECF No. 28, PAGEID # 2712.) But

---

[8] Elsewhere, Ms. Jackson argues that Hartford "unreasonably refused to consider any of [her] evidence." (ECF No. 28, PAGEID # 2723.) She complains that certain evidence she considers favorable was not called out by name in the appeal denial letter. As to Nurse Watts's August 2022 submission, Dr. Paugh's August 2022 psychological evaluation, and the 2021 MRI of her lumbar spine, Ms. Jackson is incorrect: the appeal denial letter does address those materials. (Admin. R. Vol. I, PAGEID # 123.) Finally, while the appeal denial letter does _not_ address Dr. Kistler's 2020 APS, the claim denial letter _does_. (_Id_., PAGEID # 151.)

22

Hartford does not say that. Instead, Hartford says that conflicting medical assessments of Ms. Jackson's functional capacity caused it to order an IME; _not_ to terminate benefits.

_Hartford's Dual Role_. Finally, Ms. Jackson points out the conflict of interest inherent in Hartford's dual-role as claims administrator and payor. "[C]ourts must consider that conflict as one factor among several in determining whether the plan administrator abused its discretion in denying benefits." *Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009). But the factor takes on less weight where, as here, there is no evidence that the decision was the product of interested consideration. *Autran*, 27 F.4th at 418 (explaining the "conclusory allegations of bias based on this (relatively common) inherent conflict do not deserve much weight" without "evidence suggesting that the conflict materialized in a concrete way to influence the administrator's decisional process") (internal quotation and citation omitted).

*     *     *

Ms. Jackson fails to prove that Hartford acted arbitrarily or capriciously when it concluded that she no longer satisfied the LTD Policy's definition of Disabled as of October 1, 2021. Her Motion for Judgment on the Administrative Record is **DENIED**.

### B.    Life Policy — Premium Waiver

Because the Court upholds Hartford's decision to terminate benefits under the LTD Policy, it does the same *a fortiori* for premium waiver benefits under the Life Policy.

IV.     **CONCLUSION**

For these reasons, Hartford's Motion for Judgment on the Administrative

Record is **GRANTED**; Ms. Jackson's is **DENIED**.


**IT IS SO ORDERED.**


/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**